USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 21, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

       :

CIRO DELLAPORTE,       :

       :

              Plaintiff,       :       12 Civ. 7043 (KPF)

       :

              v.       :       OPINION AND ORDER

       :

THE CITY UNIVERSITY OF NEW YORK,       :

*et al.*,       :

       :

              Defendants.       :

       :

------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

On September 18, 2012, Plaintiff Ciro Dellaporte ("Dellaporte" or "Plaintiff") initiated this action against his former employer, Medgar Evers College ("the College") at the City University of New York ("CUNY"),[1] as well as against his former supervisor, Cory Wright ("Wright"), and the Director of the Office of Human Resources at the College, Oswald Fraser ("Fraser") (collectively, "Defendants"). Plaintiff asserts claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 8-131 (the "NYCHRL"). Presently before the Court is Defendants' motion for summary judgment. For the reasons discussed in the remainder of this Opinion, that motion is granted.

---

[1]       CUNY is a distinct corporate body. Medgar Evers College is a constituent senior college in the CUNY system, and is not a legally cognizable entity separate and apart from CUNY. *See* N.Y. Educ. Law §§ 6202(2) and (5), 6203; *Clissuras* v. *City Univ. of N.Y.*, 359 F.3d 79, 81 n.2 (2d Cir. 2004) (per curiam).

## BACKGROUND[2]

### A.    Plaintiff's Employment

Plaintiff identifies himself as a white, Italian-American male.  (Def. 56.1 ¶ 1).  Plaintiff was initially hired by the College as a "Stationary Engineer (Provisional)" in the Buildings and Grounds Department (the "B&G Department"), and worked there from October 6, 2009, until August 25, 2011.[3] (*Id.*).  Defendant Cory Wright, an African-American male, is the Chief Administrative Superintendent at the B&G Department.  (*Id.* at ¶ 2).  Wright interviewed Plaintiff and, after Plaintiff was hired, became Plaintiff's direct supervisor for the first nine months of Plaintiff's employment.  (*Id.* at ¶¶ 2, 9). Defendant Oswald Fraser, also an African-American male, was the College's

---

[2]    The facts alleged herein are drawn from Defendants' Rule 56.1 Statement ("Def. 56.1") (Dkt. #27), and Plaintiff's responses thereto ("Pl. 56.1 Response"); Plaintiff's 56.1 Counterstatement ("Pl. 56.1") (Dkt. #39), and Defendants' responses thereto ("Def. 56.1 Response") (Dkt. #44); the Declaration of Alissa Wright ("Wright Decl.") (Dkt. #32), and the exhibits attached thereto; the Declaration of Marjorie Mesidor ("Mesidor Decl.") (Dkt. #41), and the exhibits attached thereto; and the Supplemental Affirmation of Alissa Wright ("Wright Aff.") (Dkt. #45), and the exhibits attached thereto.  For convenience, Defendants' Memorandum of Law will be referred to as "Def. Br." (Dkt. #33); Plaintiff's Opposition as "Pl. Opp." (Dkt. #38); and Defendants' Reply as "Def. Reply" (Dkt. #43).

Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Rules") requires a party moving for summary judgment to submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Rule 56.1(a).  The movant's asserted facts are deemed to be admitted unless specifically controverted by the statement served by the opposing party.  Local Rule 56.1(c).

[3]    Stationary engineers are responsible for the operation, maintenance, adjustment, testing, and repair of equipment at the College.  That equipment includes the steam power plant, air conditioning system, chiller plant, fire protection system, electro-mechanical building equipment, and related auxiliary systems.  (*See* Def. Br. 3 n.2 (citing Ex. 3)). One of the College's stated "Qualification Requirements" for a stationary engineer is the possession of a "valid license for High Pressure Boiler Operating Engineer issued by the New York Department of Buildings" (the "Stationary Engineer License" or the "License").  (Def. 56.1 ¶ 5).

Director of the Office of Human Resources at the time Plaintiff was hired; in that capacity, Fraser reviewed Plaintiff's application and approved the decision to hire him.  (*Id.* at ¶ 3).

The College's internal policies provided that any full-time external employment required prior approval of the Personnel Officer of the College. (*See* Ex. 24).  At the time Plaintiff was hired by the College, he was also working full-time at Long Island College Hospital ("LICH"), and on a *per diem* basis at both Staten Island University Hospital and Richmond Medical Center.  (Def. 56.1 ¶ 6).  At some point after October 2009, Plaintiff was terminated from his position at Staten Island University Hospital on account of his "lack of availability."  (*Id.* at ¶ 21).[4]  Thereafter, Plaintiff left LICH and began working full-time at the New York City Office of the Chief Medical Examiner ("OCME"). (*Id.* at ¶ 6).  Plaintiff has presented no evidence that he sought prior approval from the College for his external positions, and thus appears to have worked at those positions in violation of the College's policy.  (*Id.*).

Currently, the B&G Department employs nine stationary engineers, three of whom are white; one steamfitter, who is African-American; one high pressure plant tender, who is white; and one oiler, who is white.  (Def. 56.1 ¶ 41).  The three white stationary engineers were hired after Plaintiff was terminated.  (*Id.*).

---

[4]      The termination letter included as Exhibit 26 is not dated.

**B.    The Alleged Discriminatory Conduct**

Plaintiff claims three separate instances of discrimination.  First, Plaintiff alleges that Defendants denied him the opportunity to work overtime hours, in favor of allocating those hours to Plaintiffs' African-American co-workers.  (Pl. Opp. 2).  Second, Plaintiff alleges that Defendants discriminated against him by refusing to consider Plaintiff for a promotion that was ultimately awarded to an African-American male.  (*Id.*).  Third, Plaintiff claims discrimination because the College terminated Plaintiff for lacking the requisite License, when other of his African-American co-workers' Licenses had lapsed at various times without resulting in their termination.  (*Id.* at 2-3).  The facts submitted in connection with each of these instances will be reviewed in turn.

**1.    The Failure to Allocate Overtime Hours**

At the time Plaintiff was hired, there were three other stationary engineers employed at the College: Chris Millevoi, who is a white male, and Derek Oxford and William Fulcher, who are both African-American males. (Def. 56.1 ¶ 7).

For the first nine months of Plaintiff's employment, Defendant Wright, an African-American male, was his direct supervisor and was responsible for overseeing the allocation of overtime and holiday work.  (Def. 56.1 ¶¶ 9-10). Plaintiff testified that he and Wright "always had a good rapport" (Dellaporte Tr. 221-22), but nonetheless complains in this litigation that Wright discriminated against him based on Plaintiff's race.  In July 2010, Christopher

4

Aarons, a white male, was appointed Senior Stationary Engineer, and became Plaintiff's direct supervisor. (Def. 56.1 ¶ 10). As such, Aarons assumed responsibility for overseeing the allocation of overtime and holiday work. (*Id.*). In February 2011, Aarons resigned, and Davidson Phillips, an African-American male, became Plaintiff's direct supervisor. (*Id.* at ¶ 11).

Plaintiff does not take issue with the amount of overtime and holiday hours he earned under either Aarons' or Phillips' supervision. (Pl. 56.1 Response ¶ 14; Def. 56.1 ¶ 14). Instead, Plaintiff challenges only the overtime and holiday hours he earned under Wright's supervision, and even then only for a portion of that period of supervision, from approximately January to June 2010. (Pl. Opp. 3). Such a claim is curious when considered in context: for instance, in 2010, Plaintiff earned 56.5 overtime and holiday hours. (Def. 56.1 ¶ 12). Of that figure, 24 hours were earned during the first six months of the year, while Wright was Plaintiff's supervisor, and the remaining 32.5 hours were earned while Aarons was Plaintiff's supervisor. (*Id.*).

In addition, Plaintiff's three co-workers each earned overtime hours in 2010, with the most hours being allocated to Plaintiff's white co-worker, Chris Millevoi. Millevoi earned 161.5 overtime and holiday hours in 2010. (Def. 56.1 ¶ 16). Derek Oxford, who is African-American, earned 119.5 overtime and holiday hours in 2010; 24 were earned under Wright's supervision, and the remaining 95.5 hours under Aarons' supervision. (*Id.* at ¶ 15). Oxford worked overtime on at least four holidays in 2010, one of which occurred under

Wright's supervision, and three of which occurred under Aarons' supervision. (Pl. 56.1 ¶ 7). During the precise days in 2010 that Oxford earned 119.5 hours of overtime, Plaintiff worked 96 hours at his other full-time job at OCME. (Def. 56.1 ¶ 19). Plaintiff also worked eight- or sixteen-hour shifts at OCME on nine separate days in 2010 when Oxford earned overtime at the College; all of those dates fell within the period of Aarons' supervision. (*Id.* at ¶ 18).

William Fulcher, who is African-American, worked overtime on at least twelve holidays in 2010, five of which occurred under Wright's supervision, and seven of which occurred under Aarons' supervision. (Pl. 56.1 ¶ 6). Plaintiff worked eight- or sixteen-hour shifts at OCME on thirteen separate days in 2010 when Fulcher earned overtime at the College; all of those dates fell within the period of Aarons' supervision. (Def. 56.1 ¶ 17). On multiple occasions, Fulcher or Oxford earned overtime covering for Plaintiff when the latter was absent from work. (*Id.* at ¶ 20).

Plaintiff alleges that in 2010, presumably while Wright was his supervisor and oversaw the distribution of overtime hours, Plaintiff "continually" asked Wright for the opportunity to work more holiday or overtime hours, but Wright refused. (Pl. 56.1 ¶¶ 3-5, 8). Defendants deny these assertions. (Def. 56.1 Response ¶¶ 3-5, 8). Plaintiff further alleges that he complained to his union representative about the allocation of overtime hours on at least two occasions, but received no response. (Pl. 56.1 ¶ 9).

6

Plaintiff does not recall whether he raised the issue of race, or any discriminatory treatment, in these conversations. (Dellaporte Tr. 223-22).

### 2. The Failure to Consider Plaintiff for a Promotion

As noted, after Aarons resigned from his position as Senior Stationary Engineer in February 2011, the College appointed Davidson Phillips, an African-American male, as interim Senior Stationary Engineer, and convened a search committee to fill the vacant position. (Def. 56.1 ¶¶ 24-25). The search committee consisted of three individuals, including Wright and an individual who was a "white, Italian male." (*Id.* at ¶ 26).

Plaintiff alleges that upon learning of the vacant position, he called someone at the College, whose name he does not recall, to notify them of his intention to apply for the position. (Pl. 56.1 ¶ 13; Dellaporte Tr. 67-68). That person allegedly told Plaintiff that he did not need to submit an application because his application was already in his file. (Pl. 56.1 ¶ 14). Accordingly, Plaintiff did not submit an application. (*Id.*).

The committee considered and interviewed a number of candidates. Because Plaintiff did not submit an application for the position of Senior Stationary Engineer at that time, he was not interviewed or considered for that position. (Def. 56.1 ¶¶ 27, 28; Pl. 56.1 ¶ 16). Phillips was appointed to the position of Senior Stationary Engineer in May 2011. (Def. 56.1 ¶ 28).

Plaintiff alleges that he had more experience, and was more qualified than Phillips at that time. (Pl. 56.1 ¶ 17). Defendants deny this assertion.

7

(Def. 56.1 Response ¶ 17).  Plaintiff also alleges that he complained to management regarding Defendants' failure to consider him for a promotion, a point which Defendants also dispute.  (Pl. 56.1 ¶ 37; Def. 56.1 Response ¶ 37). Plaintiff has not alleged, however, that he complained about any racially disparate or discriminatory treatment during these conversations.

### 3.    Plaintiff's Termination

In May 2010, Lisa Edwards became the Assistant Vice President for Facilities Management, Campus Planning and Operations.  (Def. 56.1 ¶ 39). Defendants allege, and Plaintiff does not dispute, that Edwards placed a new emphasis on ensuring compliance with job qualification requirements.  (*Id.*).  In addition, in the fall of 2010, a new building opened at the College that contained a significant amount of new and specialized equipment.  (*Id.* at ¶ 40). Due to the complexity and amount of machinery in the new building, the College determined that it would be best if the employees working in that building had the qualifications of a stationary engineer, including the possession of a valid License.  (*Id.*).  Plaintiff avers, however, that the building in which he worked did not have high-pressure boilers, the operation of which required the licensure at issue.  (Dellaporte Aff. ¶ 41).

On March 31, 2011, Plaintiff's Stationary Engineer License expired.  (Def. 56.1 ¶ 29).  On that same day, Plaintiff injured his back at the College.  (*Id.* at ¶ 30).  Plaintiff went on medical leave from March 31, 2011, to July 11, 2011, during which time he collected approximately $10,000 in worker's

compensation benefits.  (*Id.*).  However, while Plaintiff was on medical leave from the College, he continued working at OCME as a stationary engineer. (*Id.*).

Plaintiff returned to work at the College on July 11, 2011, and was sent to speak with Fraser in the Human Resources Office.  (Def. 56.1 ¶ 31).  Fraser suspended Plaintiff without pay for his failure to maintain a valid Stationary Engineer License.  (*Id.*).  Plaintiff did not inform Fraser, or anyone at the College, that by letter dated June 13, 2011, the New York City Department of Buildings ("DOB") had specifically advised Plaintiff that it had denied his License renewal application due to Plaintiff's criminal history.  (Def. 56.1 ¶ 32).[5]

On or about July 11, 2011, Defendants sent Plaintiff a letter stating:

> [A]s a Stationary Engineer you are required to maintain a valid license as a requirement for the position.  Therefore, you are being placed on leave without pay for a maximum of thirty (30) days effective from the date of this Letter.  If there are any extenuating circumstances, please make us aware.  Otherwise, if we do not hear from you by the expiration of the thirty (30) days we will be forced to assume that you have abandoned your job.

(Pl. 56.1 ¶ 23).  Thereafter, Plaintiff "immediately" informed Defendants that his License was "in the legal process."  (*Id.* at ¶ 25).[6]

---

[5]    In 2006, Plaintiff pled guilty to theft from an agency receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A), a Class C felony.  (Def. 56.1 ¶ 33).  Plaintiff was sentenced to a term of three years' probation and ordered to pay restitution.  (*Id.*).  Defendants were aware of Plaintiff's conviction, though not, it would seem, the licensure issues that flowed from it.  (Pl. 56.1 ¶ 25).

[6]    The denial of Plaintiff's License renewal application was eventually overturned some time later.  (Pl. 56.1 ¶ 24).  Though the parties have not introduced evidence regarding when Plaintiff's License was granted, the record indicates that it may have occurred at

On August 1, 2011, Plaintiff responded by letter to Defendants:

> I am writing you this letter to inform you that I am not abandoning my position or my job.  As per our conversation in your office on July 11, 2011, I have explained to you that I was waiting for my license from the buildings department. [...] I have cooperated fully with all requests from the buildings department and as of today, I am still under review and *I have no control on when the DOB will issue me my license.*  I also explained to you that other engineers in City Agencies are being allowed to continue work while under review but Medgar Evers College chose not to extend that option to me.

(Pl. 56.1 ¶ 27 (emphasis added)).[7]

On August 25, 2011, while Plaintiff was out on suspension, he and Fraser spoke on the phone concerning Plaintiff's expired License.  (Pl. 56.1 ¶ 28).  Plaintiff alleges that he and Fraser spoke about the fact that "two other similarly situated African-American employees were allowed to work with expired licenses."  (*Id.*).  Fraser denies that the issue of race was raised in that conversation.  (Def. Response 56.1 ¶ 28).

By letter dated August 25, 2011, Fraser advised Plaintiff that his "provisional appointment as a Stationary Engineer at Medgar Evers College [...]

---

some point in 2013.  (*See* Ex. 18).  However, the date is immaterial for the purposes of this Opinion.

[7]  Plaintiff alleges that the College knowingly allowed two African-American stationary engineers, William Fulcher and Derek Oxford, to work with expired Licenses.  (Pl. 56.1 ¶¶ 21, 30, 31).  Oxford's License lapsed from July 1, 2010, to August 1, 2010, and from July 1, 2011, to July 29, 2011.  (Def. 56.1 ¶ 35).  Wright testified that in or about June 2011, Oxford showed him a letter from the DOB indicating that it had received Oxford's renewal application, that the application was being processed, and that the physical license would be mailed shortly.  (*Id.* at ¶ 36).

Fulcher's Stationary Engineer License lapsed from November 1, 2009, to April 19, 2010, and again from November 1, 2010, to December 5, 2010.  (Def. 56.1 ¶ 37).  On both occasions, neither Wright nor Fraser was aware that Fulcher's License had lapsed during the period it was lapsed.  (*Id.* at ¶ 38).

has been terminated with immediate effect due to your failure to maintain a valid High Pressure Operating Engineer License." (Def. 56.1 ¶ 34). At the time of his termination, Plaintiff had not held a valid Stationary Engineer License for nearly five months. (*Id.*).

Plaintiff alleges that his performance was "above average" during the course of his employment at the College. (Pl. Opp. 7). Defendants neither confirm nor refute this characterization. However, Fraser, Wright, and Edwards testified uniformly that during the time of Plaintiff's employment at the College, they were unaware of any complaints made by Plaintiff concerning discriminatory behavior or treatment. (Def. 56.1 ¶ 45).

## C.   Plaintiff's Equal Employment Opportunity Commission Complaint

Plaintiff filed a charge of discrimination (the "Charge") with the United States Equal Employment Opportunity Commission (the "EEOC") on December 9, 2011, alleging discrimination. (Def. 56.1 ¶ 43). Plaintiff did not check the box on the Charge for "retaliation." (*Id.* at ¶ 44). Instead, in the Charge, Plaintiff wrote:

> I was hired on September 28, 2009 as a stationary engineer. I was passed over for promotion and denied overtime to cover an open position, while another African American was allowed to work overtime. [...] I believe I was discriminated against because I am a white male, who is Italian. Respondent (Medgar Evers College) suspended me on July 11, 2011 for thirty days, the same day that I returned from worker's compensation and terminated my employment on August 25, 2011 for not having a valid license. My license had expired on March 31, 2011. Cory Wright, Chief Administrator of Building and Grounds informed Oswald Fraser of my expired license and Oswald Fraser was responsible for terminating my employment. I was suspended and fired for an

11

> expired license while 2 other African Americans were allowed to work until they received their licenses.  I believe Respondent's reason for my termination was pretext for discrimination because of my race (White) and my national origin (Italian).

(Ex. 19).

The EEOC issued a Notice of Right to Sue letter to Plaintiff on June 21, 2012.  (Def. 56.1 ¶ 46).

### D.     The Instant Litigation

Plaintiff initiated this action on September 18, 2012.  (Dkt. #1).  The case was reassigned to the undersigned on June 28, 2013.  (Dkt. #24).  Pursuant to the briefing schedule endorsed by the Honorable Richard J. Sullivan, the District Judge then assigned to the case (Dkt. #22), Defendants moved for summary judgment on August 14, 2013 (Dkt. #26).  Plaintiff filed his opposition on October 16, 2013 (Dkt. #38), and the motion was fully briefed as of the filing of Defendants' reply on November 7, 2013 (Dkt. #43).  The Court now considers Defendants' motion for summary judgment.

## DISCUSSION

### A.     Applicable Law

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating "the absence of a

genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d

13

Cir. 1986) (quoting *Quarles* v. *General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985))).

The Second Circuit "has repeatedly emphasized the need for caution about granting summary judgment to an employer in a discrimination case where ... the merits turn on a dispute as to the employer's intent." *Gorzynski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010). "Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp* v. *Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and internal quotation marks omitted). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment, and show more than 'some metaphysical doubt as to the material facts.'" *Gorzynski*, 596 F.3d at 101 (citing *Matsushita*, 475 U.S. at 586 (internal citation omitted)).

## B.   Analysis

### 1.   Plaintiff's Title VII Discrimination Claim Fails

#### a.   Plaintiff's Claims Related to the Denial of Overtime Are Time-Barred

Defendants raise a procedural bar to certain of Plaintiff's claims, arguing first that claims related to the allocation of overtime in the first half of 2010 are barred by the statute of limitations.  (Def. Br. 10-11; Def. Reply 2-3). Defendants are correct.  It is well-settled that an "aggrieved employee wishing

to bring a Title VII claim in district court must file an administrative complaint with the EEOC within 300 days of the alleged discriminatory act." *Petrosino* v. *Bell Atl.*, 385 F.3d 210, 219 (2d Cir. 2004); 42 U.S.C. § 2000e-5(e).  While Plaintiff's Charge was timely filed on December 9, 2011, Title VII "precludes recovery for *discrete* acts of discrimination … that occur outside the statutory time period, irrespective of whether other acts of discrimination occurred within the statutory time period." *Mark* v. *Brookdale Univ. Hosp.*, No. 04 Civ. 2497 (JBW), 2005 WL 1521185, at *16 (E.D.N.Y. June 22, 2005) (emphasis in original) (citing *Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 114-15 (2002)).  This is because "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"  *Id.* (internal citation omitted).

Plaintiff concedes that his claims for the denial of overtime would otherwise fall outside of the relevant statute of limitations, but argues that the claims are saved by the continuing violation exception.  (*See* Pl. Opp. 14).  And, in fact, an exception to the 300-day statute of limitations exists where plaintiff establishes a "continuing violation."  *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113.  Under this exception, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone."  *Hongyan Lu* v. *Chase Inv. Serv. Corp.*, 412 F. App'x 413, 416 (2d Cir. 2011) (internal citations

15

omitted) (summary order).  The Second Circuit, however, has "cautioned … that while this theory may apply to 'cases involving specific discriminatory policies or mechanisms, … multiple incidents of discrimination, *even similar ones*, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation.'"  *Id.* (citing *Lambert* v. *Genessee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993) (emphasis in *Hongyan Lu*)).

Plaintiff's argument falls short because he has failed to allege facts demonstrating that the denial of overtime was pursuant to any College policy — and, consequently, has failed to demonstrate an entitlement to the continuing violation exception.  In fact, by Plaintiff's own admissions, any such College policy ended as of July 1, 2010, when Aarons, a white male, became Plaintiff's supervisor, and began allocating overtime hours to Plaintiff's liking.[8]

---

[8]     Even if Plaintiff's claims for denial of overtime were not time-barred, they nonetheless fail to give rise to an inference of discrimination.  The undisputed evidence reveals that Plaintiff was allocated 24 overtime hours during Wright's supervision in 2010.  *See* Background Sec. B(1), *supra*.  Yet Plaintiff's African-American coworker, Derek Oxford, was also allocated 24 hours during that same period.  *Id.*  The parties have submitted evidence regarding the hours worked by Fulcher and Millevoi, but have failed to differentiate those hours by date (and thus, by supervisor).  As such, Oxford is the only true comparator based upon the record currently before the Court.  It strains belief to imagine how the Court could infer racial bias from the perfectly equal distribution of overtime hours during a six-month period.

Seeing this, Plaintiff argues in response that he was denied *holiday* overtime hours, which pay substantially more than the mandatory overtime hours he was allocated.  While Plaintiff has made this distinction with regard to his own hours, he has not done the same with regard to Oxford's or Fulcher's overtime hours, of which the record only reveals the total number.  (*See* Def. Reply 4 n.3).  While comparing proverbial apples to oranges may allow Plaintiff to arrive at the legal outcome he desires, the Court cannot and will not do the same.

Moreover, it is worth noting that Millevoi, who is white, received vastly more overtime hours in 2010 than any of his co-workers.  (Def. 56.1 ¶ 16).  What is more, Oxford was allocated three times as many overtime hours under Aarons' supervision than under Wright's.  (*Id.* at ¶ 15; Pl. 56.1 ¶ 7).  If Wright was favoring Oxford because he was also

16

"[T]he continuing violation exception does not apply because each denial of overtime, training, and change in duties are considered individual 'discrete acts' against [plaintiff]." *Anderson* v. *N.Y.C. Dep't of Corr.*, No. 12 Civ. 4064 (RJS) (RLE), 2013 WL 5229790, at *3 (S.D.N.Y. Sept. 17, 2013) (citing *Elmenayer* v. *ABF Freight System, Inc.*, 318 F.3d 130, 134-35 (2d Cir. 2003) (holding that a supervisor's denial of an employee's request to consolidate his break time on Fridays to attend prayer was not a "continuing violation" under Title VII), and *Bazemore* v. *Friday*, 478 U.S. 385, 395 (1986) (holding that each time the employer unlawfully deducted pay from the employee's paycheck was a "discrete act" that was not subject to the "continuing violation" exception)). Even taking Plaintiff's allegations as true, each denial of overtime does not in and of itself convert these discrete acts to a policy. *See Valtchev* v. *City of N.Y.*, 400 F. App'x 586, 588-89 (2d Cir. 2010) ("multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation" (internal citation omitted)) (summary order). Accordingly, Defendant is entitled to summary judgment on Plaintiff's claims in connection with the denial of overtime in 2010.

### b. Plaintiff Fails to Allege a Title VII Violation

"Under Title VII of the Civil Rights Act of 1964, 'it shall be unlawful employment practice for an employer ... to fail or refuse to hire or to discharge

---

African-American, it makes little sense for Aarons to "favor" Oxford even more. The undisputed facts simply do not give rise to any inference of discrimination.

any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 786 (1998) (quoting 42 U.S.C. § 2000e-2(a)(1)).

The Court applies the "familiar" burden-shifting approach set forth by the Supreme Court in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973). *See Taddeo* v. *L.M. Berry and Co.*, 526 F. App'x 121, 122 (2d Cir. 2013) ("At the summary-judgment stage, properly exhausted Title VII claims are ordinarily analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp.* v. *Green*, and its progeny." (internal citations omitted)) (summary order). Under this framework, "a plaintiff 'bears the burden of establishing a prima facie case of discrimination,' which includes demonstrating that 'he suffered an adverse employment action ... under circumstances giving rise to an inference of discriminatory intent.'" *Maraschiello* v. *City of Buffalo Police Dep't.*, 709 F.3d 87, 92 (2d Cir. 2013) (quoting *Mathirampuzha* v. *Potter*, 548 F.3d 70, 78 (2d Cir. 2008)). "'Once the prima facie case has been shown, the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action.'" *Id.* (quoting *United States* v. *Brennan*, 650 F.3d 65, 93 (2d Cir. 2011)).

It is undisputed that there is no direct evidence of discrimination.  Thus, to establish a prima facie case of discrimination, as Plaintiff claims here, Plaintiff must show that (i) he is a member of a protected class; (ii) he was

qualified for the position he held; (iii) he suffered an adverse employment action; and (iv) the adverse action took place under circumstances giving rise to an inference of discrimination.   *See, e.g.*, *Reynolds* v. *Barrett*, 685 F.3d 193, 202 (2d Cir. 2012); *Ruiz* v. *Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010).   Taking the factors in turn, neither party disputes that Plaintiff is a member of a protected class, or that he suffered an adverse action, namely, his termination.   The parties dispute the remaining factors: whether Plaintiff was qualified for his position, and whether the adverse action occurred under circumstances giving rise to an inference of discrimination.

### i.      Whether Plaintiff Was Qualified for His Position

Plaintiff concedes that possession of a valid Stationary Engineer License was a requirement of his position; thus, by the stated requirements of his position, Plaintiff was rendered unqualified as of March 31, 2011, the date his License expired.   (Dellaporte Tr. 245-46; Ex. 5, 12).   Undeterred by this fact, Plaintiff argues that because his African-American co-workers Fulcher and Oxford were not terminated for various lapses in their licensure, the License must not have truly been a job requirement.   (Pl. Opp. 18-20).   While the evidence before the Court — Plaintiff's testimony, Defendants' testimony, and the stated requirements of Plaintiff's job — reveal that the License is a necessary job requirement, the Court is mindful that the inconsistent application of a job requirement could create an issue of fact as to whether that requirement is part of the employer's "honestly-held expectations."   *Ruiz*, 609 F.3d at 493 (holding that "if the employer is applying its criteria for satisfactory

19

job performance in an inconsistent, arbitrary, or discriminatory manner, then there is a question of fact as to whether the criteria reflect the employer's 'honestly-held expectations'" (citation omitted)).  However, this issue of fact is immaterial because Plaintiff has failed to establish a prima facie showing of discriminatory intent, and has failed to rebut Defendants' legitimate, non-discriminatory reason for firing him.

### ii.  Whether the Circumstances Give Rise to An Inference of Discriminatory Intent

An inference of discrimination may be discerned from a variety of circumstances, including, "the employer's criticism of the plaintiff's performance in ethnically degrading terms," the employer's "invidious comments about others in the employee's protected group," or "the more favorable treatment of employees not in the protected group."  *Chambers* v. *TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (internal citations omitted).

As a preliminary matter, however, Plaintiff must overcome two strong inferences.  First, where, as here, the same person was involved in the hiring and firing of a plaintiff, the presumption against racial bias is difficult to overcome.  "[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire."  *Grady* v. *Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997); *see also Anderson* v. *Hertz Corp.*, 507 F. Supp. 2d 320, 330 (S.D.N.Y. 2007) (holding that the "same actor" inference applied where the defendant hired plaintiff and

20

fired him ten months later); *Figueroa* v. *New York Health & Hospitals Corp.*, 500 F. Supp. 2d 224, 236 (S.D.N.Y. 2007) (finding no inference of discrimination when plaintiff alleged discrimination at the hands of same supervisor who approved plaintiff's promotion).

While Plaintiff is correct that the same actor inference is "but one factor for a district court to consider," that inference is particularly strong here, where Fraser and Wright hired Plaintiff in 2009, and fired him less than two years later.[9]  Plaintiff's allegations of discrimination beginning in January 2010 must thus be viewed in context of Defendants' willingness to hire Plaintiff a scant three months earlier.  Adding to this context is Plaintiff's concession that he had a "good rapport" with Wright (Dellaporte Tr. 221-22), which further "undercuts any finding of racial animus."  *Liburd* v. *Bronx Lebanon Hosp. Ctr.*, No. 07 Civ. 11316 (HB), 2009 WL 900739, at *5 (S.D.N.Y. Apr. 3, 2009).

Plaintiff must also overcome the inference that arises from Defendants' diverse workplace.  *See Liburd*, 2009 WL 900739, at *5 (dismissing discrimination claims where "statistic[al evidence] evince[d] substantial racial

---

[9]     Plaintiff cites two factually inapposite cases in support of his argument here.  (Pl. Opp. 12).  First, the same actor presumption was overcome in *Eldaghar* v. *City of New York Dep't of Citywide Admin. Servs.*, No. 02 Civ. 9151 (KMW) (HBP), 2008 WL 2971467, at *9-10 (S.D.N.Y. July 31, 2008), because the defendants were unaware of the plaintiff's national origin at hiring.  Here, Plaintiff has proffered no evidence that Wright and Fraser did not know he was a white, Italian-American male at the time he was hired.  In *Brown* v. *Baldwin Union Free Sch. Dist.*, the court denied summary judgment where the defendants, who had been involved in plaintiff's promotion and termination, had made numerous race-based remarks to the plaintiff.  603 F. Supp. 2d 509, 516-17 n.3 (E.D.N.Y. 2009).  Here, there is no evidence that Wright or Fraser made *any* comments that were even broadly related to race over the two years of Plaintiff's employment at the College.

21

diversity among the employees comparable to Plaintiff and negate[d] any

inference of discrimination that otherwise might have been created" (internal

citation omitted)).  During Plaintiff's employment, the B&G Department

employed two white stationary engineers and two African-American stationary

engineers.  It is difficult to imagine how an equally racially balanced workplace

could give rise to an inference of discriminatory animus.  In fact, after Plaintiff

was terminated, Defendants hired not one, but three, white stationary

engineers.[10]  It stands to reason that if Defendants were discriminating against

Plaintiff based upon his race, it would make little sense to fire one white man,

only to turn around and hire three more.  *See Shepherd* v. *BCBG Max Azria*

*Grp., Inc.*, No. 11 Civ. 7634 (RJS) (AJP), 2012 WL 4832883, at *18 (S.D.N.Y.

Oct. 11, 2012), *report and recommendation adopted sub nom. Shepherd* v. *Azria*,

No. 11 Civ. 7634 (RJS) (AJP), 2012 WL 6150854 (S.D.N.Y. Dec. 10, 2012) ("the

diversity of the employees at BCBG's Madison Avenue store, all of whom were

either hired or supervised by [the defendant] … further negates any inference of

discrimination from this alleged remark" (collecting cases)); *Baffa* v. *STAT*

*Health Immediate Med. Care, P.C.*, No. 11 Civ. 4709 (JFB) (GRB), 2013 WL

5234231, at *13 (E.D.N.Y. Sept. 17, 2013) (granting summary judgment where

"plaintiff was unable to provide any explanation as to why, if defendant was

---

[10]     In response to Defendants' undisputed hiring statistics, Plaintiff argues that while these
statistics are "encouraging," they do not "address [Defendants'] specific treatment of
Plaintiff Dellaporte in his time in their employ."  (Pl. Opp. 13).  Of course, departmental
statistics, by definition, do not tell the story of one individual's treatment.  But
Plaintiff's allegations of discriminatory treatment must be viewed in context of what is
concededly a diverse workplace.  *See Shepherd*, 2012 WL 4832883, at *18.

discriminating against her because she was pregnant, defendant would ultimately hire a pregnant woman to replace her" (internal citation omitted)).

Turning now to Plaintiff's prima facie case, Plaintiff first argues that an inference of discrimination can be gleaned from Defendants' failure to consider Plaintiff for a promotion in 2011. (Pl. Opp. 16-17). It is undisputed that Plaintiff did not apply for this promotion, and that for this reason he was not considered. (Def. 56.1 ¶¶ 27, 28). Plaintiff's excuse for not applying — that an unnamed employee of the College told Plaintiff that his application was already on file — does not discharge Plaintiff's burden here. (Pl. 56.1 ¶ 13; Dellaporte Tr. 67-68). Plaintiff has not alleged that the unnamed employee harbored any sort of discriminatory animus; that she even knew Plaintiff's race or national origin (which she was unlikely to have discerned over the telephone); that she used discriminatory or derogatory terms when she spoke with Plaintiff; or that Plaintiff's supervisors were aware of this conversation. The unnamed employee simply told Plaintiff not to apply, and Plaintiff did not.

Plaintiff has cited no case for the proposition that failure to consider a plaintiff for a promotion for which he did not apply *ipso facto* gives rise to an inference of discrimination. Though Plaintiff cites law regarding the applicable standards in failure-to-promote cases, it is worth noting that Plaintiff has not alleged a failure-to-promote claim, and cannot do so for the first time in his opposition papers. *See* n.11, *infra*. It is also notable that one member of the search committee was a white, Italian male. Furthermore, there is no evidence

that the search process itself was in any way discriminatory.  Quite to the contrary: the evidence shows that the search committee evaluated the pool of candidates before them and chose one from among that pool.  (Edwards Aff. ¶ 12; Ex. 10).  Plaintiff has failed to put forth any evidence from which discriminatory intent can be inferred.

Second, Plaintiff alleges that his termination for having an expired License was discriminatory, because Defendants allowed two African-American stationary engineers to continue working with lapsed Licenses.[11]  As discussed *supra*, the "same actor" and diverse workplace inferences weigh heavily against finding an inference of discrimination here.  Both Wright and Fraser were involved in the hiring and firing of Plaintiff, and both hired three white male stationary engineers after Plaintiff's termination.  Yet even assuming Plaintiff has established a prima facie case of discrimination as to his termination, his claim nonetheless fails because Defendants have proffered a legitimate, non-discriminatory reason for his termination, and Plaintiff has failed to establish that it was pretextual.

---

[11]    Plaintiff alleges that Defendants refused to reposition Plaintiff in a subordinate role, such as an oiler, while the License was expired.  (Pl. Opp. 5).  Defendants correctly note that to the extent Plaintiff is raising a new failure to accommodate claim in his opposition papers, it is procedurally improper to do so at this late stage.  (Def. Reply. 10).  "Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that 'it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.'"  *Price* v. *Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 686 (S.D.N.Y. 2011) (internal citation omitted).

### c. Defendants Have Proffered a Legitimate, Non-Discriminatory Reason for Terminating Plaintiff

Defendants terminated Plaintiff's employment for his failure to maintain a valid Stationary Engineer License, which was indisputably a requirement of his job. *See, e.g.*, *Pacenza* v. *IBM Corp.*, No. 04 Civ. 5831 (PGG), 2009 WL 890060, at *12 (S.D.N.Y. Apr. 2, 2009) (finding that discharge of plaintiff for violating company "internet usage and harassment policies" was a legitimate, non-discriminatory reason for termination); *Brown* v. *The Pension Boards*, 488 F. Supp. 2d 395, 406 (S.D.N.Y. 2007) ("'Certainly, an employer is entitled to discharge an employee who fails to follow company rules ....'" (internal citation omitted)).  The Court can imagine, and Defendants have proffered, a host of reasons why it would be advisable to possess a valid License to operate complicated and potentially hazardous equipment.  Moreover, Plaintiff admits that possession of this License was a requirement of his job.  Defendants have thus demonstrated a legitimate, non-discriminatory reason for Plaintiff's termination, and the burden now shifts to Plaintiff to prove that the reason was pretextual.  *See James* v. *New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000) (holding that "once the employer 'articulates a non-discriminatory reason' for its actions, [...] the presumption completely 'drops out of the picture,'" and further stating that "once the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment (or to the overturning of a plaintiff's verdict) unless the plaintiff can point to

evidence that reasonably supports a finding of prohibited discrimination").

Plaintiff cannot make this showing.

"A plaintiff may satisfy his or her burden at the pretext stage by showing that similarly situated employees outside the protected class received more favorable treatment than the plaintiff did." *Anderson*, 507 F. Supp. 2d at 327 (citing *Graham* v. *Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). To be similarly situated with Plaintiff, those individuals must be "similarly situated in all material respects." *Shumway* v. *United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) (citing *Mitchell* v. *Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

> Courts in this District have found that
>
> What constitutes "all material respects" ... varies somewhat from case to case and ... must be judged based on [i] whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and [ii] whether the conduct for which the employer imposed discipline was of comparable seriousness. In other words there should be an "objectively identifiable basis for comparability."

*Conway* v. *Microsoft Corp.*, 414 F. Supp. 2d 450, 459-60 (S.D.N.Y. 2006) (citing *Graham*, 230 F.3d at 40). Finally, while the determination of whether two employees are similarly situated is normally a question of fact for the jury, "[t]his rule is not, however, an absolute. A court can properly grant summary judgment where no reasonable jury could find the similarly situated prong met." *Spiegler* v. *Israel Disc. Bank of New York*, No. 01 Civ. 6364 (WK), 2003 WL 21983018, at *2 (S.D.N.Y. Aug. 19, 2003) (internal citations omitted).

Plaintiff argues that because two similarly-situated African-American stationary engineers were permitted to work with expired Licenses, Defendants' reason for terminating Plaintiff must have been pretextual.  (Pl. Opp. 17-20).  Put simply, Fulcher and Oxford were not similarly situated to Plaintiff.  Fulcher's License lapsed between November 1, 2009, and April 19, 2010.  Plaintiff attempts to create a material issue of fact by averring that in July 2010 — *after* Fulcher had obtained a valid License — Plaintiff informed Wright that Fulcher's License had been lapsed for almost a year.  (Dellaporte Aff. ¶ 10).  Even if Plaintiff had told Wright, after the fact, that Fulcher's License had lapsed, it does not change or undermine Wright's testimony that he was unaware of the lapse *at the time the License was lapsed.*[12]  Thus, as here, "[a]n employee who allegedly engaged in misconduct comparable to the plaintiff's is not similarly situated to the plaintiff when the employer is unaware of what the comparator employee supposedly did."  *Dinkins* v. *Suffolk Transp. Serv., Inc.*, No. 07 Civ. 3567 (JFB), 2010 WL 2816624, at *10 (E.D.N.Y. July 15, 2010) (collecting cases).  The second lapse in Fulcher's License lasted 35 days.  (Def. 56.1 ¶ 37).  By contrast, when Plaintiff was fired he had not held a valid

---

[12]    Defendants note that Lisa Edwards was appointed in May 2010 and placed a newfound emphasis on enforcing job requirements.  (Def. Reply 10 (citing Edwards Aff. ¶¶ 1, 8, 13)).  On this basis as well, to the extent Plaintiff seeks to compare his situation with Fulcher's 2009 lapse, the comparison fails.  *See Shumway*, 118 F.3d at 64-65 (similarly situated individuals were those caught violating a previously-unenforced policy under the supervision of the newly-enforcing manager, not the previous manager).

License for more than 150 days.  (*Id.* at ¶ 34).  Fulcher is not similarly situated to Plaintiff.[13]

Oxford's License lapsed from July 1 to August 1, 2009, and again from July 1 to July 29, 2011.  (Def. 56.1 ¶ 35).  As an initial matter, both lapses lasted for more than four months less than did Plaintiff's.  And Wright testified that during the second lapse, Oxford showed him a letter from the DOB noting that his application renewal had been processed and the License would soon be in the mail.  By contrast, Plaintiff made no comparable showing to Wright; in fact, he neglected to mention to the College that his application for renewal had been denied only days after his suspension went into effect.  Five months after the expiration, in August 2011, Plaintiff still could not advise the College of any time frame within which it could expect him to receive his License. (Pl. 56.1 ¶ 27 ("I have no control on when the DOB will issue me my license.")).  Perhaps what is most important is that Plaintiff's application renewal was actually *denied*; this was not simply a case in which he had failed to apply in a timely fashion for renewal, thereby allowing his License to lapse.  (Def. 56.1 ¶ 32).

---

[13]     Plaintiff argues that Davidson Phillips' License also lapsed, but that he was permitted to continue working and was even promoted to Senior Stationary Engineer.  (Pl. Opp. 7, 19).  Yet in so arguing, Plaintiff cites deposition testimony from Defendant Wright stating that Phillips' License never actually lapsed.  (Wright Tr. 90-91).  Wright testified that Phillips notified Wright one month prior to his License termination date that he had encountered an administrative problem with his application, but that he would obtain the License soon.  (*Id.*).  As Phillips' License never actually lapsed, he is not similarly situated to Plaintiff and this instance cannot support an inference of discrimination.

Tellingly, Plaintiff has not alleged that either Fulcher's or Oxford's License renewals were ever denied, but only that they lapsed.

The record is quite clear: possessing a valid Stationary Engineer License was a stated requirement for Plaintiff's job. (*See, e.g.*, Ex. 5). Plaintiff argues that he was "not afforded" any "leniency" or "leeway" by Defendants when his "own license renewal was delayed." (Pl. Opp. 12, 20). The undisputed facts belie that statement. Defendants did not fire Plaintiff on the day his License expired. Far from it: Plaintiff was given multiple opportunities, and over five months, to obtain the License or show proof that it was forthcoming. (Def. 56.1 ¶ 34; Pl. 56.1 ¶¶ 23, 28). Plaintiff did not, and it appears, could not; after all, Plaintiff was fired from OCME nearly two years later for his failure to maintain that same License. (Def. 56.1 ¶ 42). In short, Plaintiff has failed to establish that his termination was mere pretext, having failed to demonstrate that similarly situated employees were treated differently.

### 2. Plaintiff's Title VII Retaliation Claim Is Barred for Failure to Exhaust Administrative Remedies

Before filing a Title VII claim in federal court, a plaintiff must exhaust all available administrative remedies and file a charge of discrimination with the EEOC within 300 days of the alleged discriminatory conduct. *Hoffman* v. *Williamsville Sch. Dist.*, 443 F. App'x 647, 649 (2d Cir. 2011) ("Before filing a Title VII claim in federal court, a plaintiff must exhaust all available administrative remedies.... An allegation not set forth in an administrative charge will be barred as unexhausted unless it is reasonably related to the

allegations in the charge." (internal citations omitted)) (summary order).
Plaintiff did not do this and, as such, his retaliation claim is barred.

"A district court may only hear claims that are either included in the
EEOC charge or are based on conduct which is reasonably related to conduct
alleged in the EEOC charge." *Fiscina* v. *New York City Dist. Council of
Carpenters*, 401 F. Supp. 2d 345, 356 (S.D.N.Y. 2005). The Second Circuit
instructs that "'a claim is considered reasonably related if the conduct
complained of would fall within the scope of the EEOC investigation which can
reasonably be expected to grow out of the charge that was made.'" *Williams* v.
*New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (quoting *Fitzgerald* v.
*Henderson*, 251 F.3d 345, 359-60 (2d Cir. 2001)). "This exception to the
exhaustion requirement is essentially an allowance of loose pleading and is
based on the recognition that EEOC charges frequently are filled out by
employees without the benefit of counsel and that their primary purpose is to
alert the EEOC to the discrimination that a plaintiff claims he is suffering."
*Deravin* v. *Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (internal citation and
quotation marks omitted). To determine whether a claim is "reasonably
related" to a claim included in an EEOC charge, courts should focus "on the
factual allegations made in the EEOC charge itself, describing the
discriminatory conduct about which a plaintiff is grieving," and ask the "central
question" of "whether the complaint filed with the EEOC gave the agency

adequate notice to investigate discrimination on both bases." *Williams*, 458 F.3d at 70 (internal citation and quotation marks omitted).

"A retaliation claim raised for the first time in federal court based on conduct that occurred before the EEOC Charge was completed is only 'reasonably related' to the EEOC discrimination complaint if the Charge contained factual allegations that would put the EEOC on notice of the underlying protected activity or suspected retaliatory animus." *Shepherd*, 2012 WL 4832883, at *25 (citing *O'Hara* v. *Mem'l Sloan-Kettering Cancer Ctr.*, 27 F. App'x 69, 70-71 (2d Cir. 2001) ("Retaliation is a theory of liability that is substantively distinct from [plaintiff's] age discrimination claim. The scope of an EEOC investigation cannot reasonably be expected to encompass retaliation when [plaintiff] failed to put the agency on notice that she had engaged in the type of protected activity that is the predicate to a retaliation claim.") (summary order), *Henny* v. *New York*, 842 F. Supp. 2d 530, 558 (S.D.N.Y. 2012) (finding that a retaliation claim was not reasonably related where plaintiff's "administrative complaint does not say that Plaintiff complained at all"), and *Jenkins* v. *N.Y.C. Transit Auth.*, 646 F. Supp. 2d 464, 472-73 (S.D.N.Y. 2009) (collecting cases holding that retaliation claims were not reasonably related where the EEOC charges "were devoid of any reference to a retaliatory motive or any allegation that the plaintiff had engaged in a protected activity")).

Defendants argue that Plaintiff's retaliation claim is barred for his failure to exhaust administrative remedies, and the Court agrees. (Def. Br. 19-20; Def.

Reply 6-7).  Plaintiff not only failed to check the box for "retaliation" on the

EEOC Charge, but actually foreclosed any inference of retaliation by admitting,

twice, on the Charge that he had been fired for his failure to maintain a

Stationary Engineer License, and *not* in retaliation for any protected activity.

(Ex. 19 (noting that "[Defendants] terminated my employment on August 25,

2011 for not having a valid license," and that "I was suspended and fired for an

expired license")).  Nowhere on the Charge does Plaintiff allege that he reported

anything to Defendants regarding race.  (*Id.*).[14]

---

[14]    As with Plaintiff's claim regarding overtime, even if Plaintiff's retaliation claim were not procedurally barred, it would fail on the merits.  "To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show '[i] that she was engaged in protected activity by opposing a practice made unlawful by Title VII; [ii] that the employer was aware of that activity; [iii] that she suffered adverse employment action; and [iv] that there was a causal connection between the protected activity and the adverse action.'" *Holtz*, 258 F.3d at 79 (quoting *Galdieri-Ambrosini* v. *Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).  Plaintiff has failed to make this showing.  Plaintiff testified that he complained to Wright and his union representative about the allocation of overtime hours, but does not allege that he complained about any racially discriminatory allocation of overtime hours.  (Dellaporte Tr. 221-23).  Even at his deposition, Plaintiff was asked whether, during the course of his employment at the College, he had ever "ma[de] any complaint to anybody regarding what you thought was discriminatory treatment," to which Plaintiff replied "No, I just figured I always had a good rapport with Mr. Wright … and I didn't take it at that point until I had been terminated then I said, you know what?  I'll take my legal right."  (*Id.* at 221-22).  Thus by Plaintiff's own admission, he never complained about any discriminatory treatment until *after* he had been terminated.  Defendants could not have been aware of Plaintiff's protected activity because there was none.

Moreover, Plaintiff has failed to establish a causal connection between any claimed protected activity and his termination.  Even if Plaintiff's complaints about the allocation of overtime hours could be deemed protected activity, Plaintiff has not shown that his termination was in any way related to his complaints nearly two years earlier.  *See Clark Cnty. Sch. Dist.* v. *Breeden*, 532 U.S. 268, 273 (2001) (noting that to establish a prima facie case, the temporal proximity must be "very close" to be sufficient evidence of causality between "an employer's knowledge of protected activity and an adverse employment action"); *Burkybile* v. *Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005) (finding that passage of more than a year defeated a showing of causation).

Plaintiff argues that Defendants could have been on notice that he sought to assert a retaliation claim.  (Pl. Opp. 21-23).  Yet Plaintiff misapprehends the standard: it is not whether Defendants could have been on notice of his retaliation claim, but whether the EEOC was on notice of that claim.  *Hoffman*, 443 F. App'x at 649 ("A new allegation will be considered reasonably related if the administrative charge provided the EEOC with sufficient notice to investigate the allegation."); *O'Hara*, 27 F. App'x at 70-71 ("The scope of an EEOC investigation cannot reasonably be expected to encompass retaliation when [plaintiff] failed to put the agency on notice that she had engaged in the type of protected activity that is the predicate to a retaliation claim.").  Plaintiff's own choice of language in the Charge forecloses his retaliation claim.  Defendants are entitled to summary judgment on Plaintiff's retaliation claim.

### 3. The Court Declines to Exercise Jurisdiction over Plaintiff's NYCHRL Claims

Having dismissed Plaintiff's federal claims, the Court declines to exercise jurisdiction over Plaintiff's NYCHRL claims.  *See, e.g., Yu* v. *New York State Unified Court Sys. Office of Court Admin.*, No. 11 Civ. 3226 (JMF), 2013 WL 3490780, at *8 (S.D.N.Y. July 12, 2013) (granting summary judgment on federal claims but declining to exercise jurisdiction over NYCHRL claims, in part because they involve the application of "different standards"); *Vuona* v. *Merrill Lynch & Co., Inc.*, No. 10 Civ. 6529 (PAE), 2013 WL 271745, at *28 (S.D.N.Y. Jan. 24, 2013) (granting summary judgment on federal claims but

declining to exercise supplemental jurisdiction over NYCHRL claims, in part because the NYCHRL requires application of a standard "with which the [New York] state courts are more familiar").

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.  The Clerk of Court is directed to terminate Docket Entry 26, and to mark the case as closed.

SO ORDERED.

Dated:      February 21, 2014
            New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge